UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                    )
WILLIAM A. & MARITZA STORIE,        )
        Plaintiffs,                 )
                                    )
VS.                                 )        No. 03-40268-FDS
                                    )
HOUSEHOLD INTERNATIONAL, INC.,      )
BENEFICIAL FINANCE CORP.,           )
        Defendants.                 )
                                    )
```

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## TO RECONSIDER ORDER OF DISMISSAL

Plaintiffs, William A. & Maritza Storie, pro se, respectfully submit this Memorandum in

Support of Plaintiff's Motion to Reconsider Order of Dismissal.   Plaintiffs pray that this Federal

Court will reverse its Order Granting Defendant's Motion to Dismiss. As grounds for this

Request to Reconsider, Plaintiffs will offer "new evidence" not available until after the order was

issued.  New evidence will include cases in Washington State, California and Nevada, which

determined the exact same Household-Beneficial Arbitration Agreement to be Unconscionable,

both procedural and substantive and therefore not enforceable.  Further, new information was

offered to Plaintiff, William Storie on 2/4/05, regarding Defendant's training of loan officers

regarding the signing of the Arbitration Agreement by former Beneficial Loan Officer, Suzanne

Rauscher.  Ms. Rauscher was Defendants' loan officer regarding the loan in which Plaintiff's

lawsuit is based.  Defendants have placed Plaintiffs in a quandary regarding this argument.

There is a question as to whether the Arbitration Agreement was signed at all.  In preparing this

memorandum, Plaintiffs located their "Customer Copy" of the Arbitration Agreement.

Plaintiff's copy was not signed by anyone. This lends to many serious questions about the validity of the Agreement, possible fraud, and may serve a dual purpose for Defendants. Having two copies that differ to be able to present as evidence creates unfair bargaining power. Defendants again cannot have it both ways.

## I.    Applicable Standards

Plaintiff's motion for reconsideration is pursuant F.R.C.P. 59 (a)(2), "in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment." Motions to Reconsider "are, as a practical matter, the same thing as motions for amendment of the judgment under Fed.R.Civ.P. 59(e)" and are treated under the standard for this federal rule. Accordingly, a motion for reconsideration must "adhere to stringent standards." Gold v. Dalkon Shield Claimants Trust, No. 5:82-CV-383 (EBB), 1998 WL 422900 at *2 (D. Conn. 1998). The movement must show that the court overlooked matters or controlling decisions, which might reasonably have altered the court's result. Schonberger v. Serchuk, 742 F.Supp. 108, 119 (S.D.N.Y. 1990). Specifically, "Rule 59(e) recognizes only three possible grounds for any motion for reconsideration: (1) an intervening change in the law; (2) the availability of new evidence not previously available; and (3) the need to correct a clear error of law or prevent manifest injustice." Gold, 1998 WL 422900 at *2; See also, Doe v. New York City Dep't of Social Services, 709 F.2d 782, 789 (2d. Cir. 1983). The application of these standards is intended to prevent "wasteful repetition of arguments already briefed, considered and decided." Schonberger, 742 F.Supp. at 119.

2

Plaintiffs will ask the court to reconsider their order of Dismissal on the grounds of new evidence offered by former Loan Officer, Suzanne Rauscher. She stated to Plaintiff, William Storie, on 2/4/05, that she was trained to represent that the signing of Defendants' Arbitration Rider was a contingency in obtaining a loan. Plaintiffs request that this court consider Plaintiffs' financial duress and undue influence arguments if Plaintiffs signed the Arbitration Agreement as a result of information provided by Ms. Rauscher's, as they are very interconnected. Plaintiffs honestly cannot remember whether they signed the Arbitration Agreement or not. "Massachusetts has recognized economic duress upon a showing that one side involuntarily accepted the terms of another, the circumstances permitted no alternative and the circumstances were a result of coercive acts of the other party. International Underwater Contractors, Inc., v. New England Telephone and Telegraph Co., Inc., 8 Mass.App.Ct 340, 342,393 N.E.2d 968,970 (Mass.App.Ct. 1979. Further, "Massachusetts courts have recognized and adopted the principles of **undue influence** as outlined in the Restatement (Second) of Contracts § 319 (1)(1977). Section 319(1) defines undue influence as 'unfair persuasion of one party under the domination of another,' and Massachusetts follows this definition." See Surrender of Minor Children, 344 Mass. 230, 234-235, 181, N.E. 2d. 836 (1962); Neill v. Brackett, 234 Mass. 367, 369-370, 126 N.E. 93 (1920). (emphasis added).

## I.    Background

In July 2000 Plaintiffs, William & Maritza Storie, husband and wife, allege Defendants lured them into a high-cost mortgage. This began with the receipt, in first class mail, of an unsolicited live check for $4000 in July 2000. See Ex. A. Beneficial or more accurately "Household" then looked at Plaintiffs credit report on 7/10/00. See Ex. B. Beneficial loan

3

officer, or agent, Suzanne Rauscher then called plaintiff, William Storie, and had him to come

in to their office in Worcester, MA to discuss other financial options that might **benefit**

Plaintiffs.  Plaintiffs were in the midst of a major financial crisis in part due to the stock

market plunge, a first mortgage (Note past due amount on 7/10/00 invoice, $2,478).  See

Ex. C, a modest to low one-income household, See Ex. D (Plaintiff, William Storie's 2000 W-

2 form), credit card debt, See Ex. E, a car loan, See Ex. F, tractor loan, See Ex. G, and three

small children.  Plaintiffs felt desperate and were in fear of losing their home.   Notices of

default were being sent and GMAC Mortgage was sending assessors to view Plaintiff's

property.  See Ex. H.  Plaintiffs explained their financial situation to Ms. Rauscher.  Ms.

Rauscher urged Plaintiff, William Storie, to consolidate their debt and offered a "monthly

savings" report in order to persuade Plaintiff to enter the loan.  See Ex. I.  Plaintiffs did not

want to place a $17,000 - 0% car loan in the loan.  Ms. Rauscher, after saying she consulted

with her supervisor, stated, "you can't get the loan if you don't put in the car loan ".  On

August 24, 2000 Plaintiffs signed paperwork for what they thought was a Home Equity Loan.

As part of the closing of this loan, Defendants have offered evidence that Plaintiff, William

Storie signed an Arbitration Agreement.  See Ex. J.  Although Plaintiff, Maritza Storie

requested to sign all paperwork she was not allowed to do so.  Defendants cited her credit was

not good enough for her to sign all documents.  Defendants did mandate that Plaintiff, Maritza

Storie, sign the mortgage note but represented in that, she was "part of the loan".

On 10/30/04 in Worcester Superior Court, Plaintiff, William Storie brought suit against

Defendants, (Household-Beneficial), alleging predatory lending violations, including Spurious

Open-End Credit and violations of Mass. Gen Laws Chapter 93A.  Plaintiff, Maritza Storie

4

was added to the complaint on 11/4/04, which was amended, and cited violations of State and

Federal Consumer Protection Laws, including TILA, Regulation Z, HOEPA, RESPA, 12

US.C. § 2601 *et seq.* Common Law Fraud, Material Misrepresentation, Spurious Open-End

Credit, Violations of Massachusetts Consumer Protection Laws, Chapter 93A, and

Massachusetts Consumer Credit Cost Disclosure Act, M.G.L. chapter 140D.[1]

After two hearings in Worcester Superior Court and prior to a scheduled December 29,

2004 hearing, Defendants removed the case to this Federal District Court on December 2,

2004.

After removal, Defendants filed a Motion to Dismiss or, in the Alternative, Motion to Compel

Arbitration and Stay Litigation Pending Arbitration. Defendants moved to dismiss pursuant

F.R.C.P. 12(b)(6) "failure to state a claim upon which relief can be granted" due to: 1) A

general release signed by Plaintiff, William Storie, regarding a Class Action Law suit.[2] 2)

"The expiration of the relevant statute of limitations".[3] Defendants also move to dismiss under

---

[1] Plaintiffs may seek to amend their complaint to include RICO statutes regarding Defendant's alleged predatory lending scheme, as is the case with similar lawsuits throughout the country. See Ex. K.

[2] Defendants argue this point, despite a) Plaintiff, William Storie's diligent and timely intervention by letters to opt-out after learning his claims transcend those covered in the Settlement, b) Mrs. Storie was not a party to the release but is a "co-borrower" as per her signing the Mortgage Note. Mrs. Storie should have grounds to file suit and was "joined" in this loan by her signing the note. c) Despite demands of rescission, Plaintiff William Storie was mailed a settlement check. Plaintiff William Storie did not "accept" the settlement check and sent it back to the Settlement Administrator immediately, Void. d) Significant ambiguity in the language of the release "contract" is at question. e) Plaintiffs also have learned that another class action suit involving Defendants lending practices in California mandated that any person on the mortgage note needed to sign the release. The same Settlement Administrator is managing both class actions with Defendants. Plaintiffs were mandated to "opt out" in writing in this Settlement. Rather than the "opt in", which is confusing. See Ex. Q, Page 3 ¶4. Plaintiffs did write to "Opt Out" of this Settlement.

[3] Defendants argue this point, despite Plaintiffs only learning there were issues with their loan by notification of the State Attorney General's class action settlement notice several months prior to filing their lawsuit. Plaintiff's understanding of the amount of fraud, deceit, and material misrepresentation was discovered just prior to filing suit. Continued and ongoing violations regarding the calling the loan a HELOC, when it is not, and TILA violations post filing the lawsuit in regards to "pay out" information.

F.R.C.P. 12 (b)(7) (lack of personal jurisdiction); 12(b)(4)(insufficiency of process); and 12(b)(7) failure to join indispensable party.[4]

Plaintiffs argued that the Arbitration Agreement should be void due; 1) they were fraudulently induced to enter the loan; 2) it is unconscionable under Massachusetts contract law; 3) the cost of arbitration may be prohibitive; and 4) public policy favors the public resolution of this dispute.  On 1/25/05 the case was dismissed without prejudice and compelled to arbitration.

On 1/27/05 Plaintiff discovered two cases in Federal District Courts in Washington State, Luna v. Household Finance Corp. C02-1635L 236 F.Supp. 2d 1166; 2002.  See Ex. L, and California, ACORN v. Household Finance Corp. C 02-1240 CW 211 F. Supp. 2d 1160, See Ex. M, involving the exact same arbitration agreement, which was determined to be unconscionable, both procedural and substantive.  On 2/10/05 Plaintiffs found another case in Nevada, which determined Defendant's Arbitration Rider was Unconscionable. See Ex. N. On 2/4/05, former Beneficial loan officer, Suzanne Rauscher, contacted Plaintiff William Storie.  We discussed my current action against Household and specifically the arbitration agreement and training that Ms. Rauscher received regarding the signing of the arbitration. She reported that the signing of the arbitration agreement **was a condition in obtaining the loan.**  If there were no signing of the arbitration agreement, there would be no loan.  These

---

[4] Defendants argue this as a standard they present in most lawsuits of this nature. Defendants attempt to argue that Beneficial "Massachusetts" is "correct" party, not Beneficial Finance or Household. Plaintiffs have made prima facie showing of jurisdiction. One very clear example is the use of the exact same arbitration contract of adhesion used across the country around the time the loan was obtained in 2000. "A subsidiary's contacts with the forum State can satisfy the minimum contacts test for the parent company if the subsidiary is the "general agent" for the parent in the forum state. Chan v. Society Expeditions, Inc., 39 F.3d 1398, 1405-06 (9th Cir. 1994).

four new pieces of evidence could alter this court's prior order of dismissal and compel this case forward in this Federal Court.

On 2/13/05, while preparing this memorandum, Plaintiffs located their "Customer Copy" of the Arbitration Agreement. This "Customer Copy" was not signed at all.  This has placed Plaintiffs in a quandary since up until that point, Plaintiffs assumed, by the evidence presented by Defendants, that the arbitration agreement had been signed.  Plaintiffs had not seen their copy of the agreement in the mounds of paperwork created since taking on this case. Plaintiffs cannot truly say they recall signing the arbitration agreement either.  Plaintiffs will argue the regardless whether they signed the arbitration agreement or not, they should not be bound by its terms.  Defendants possible motives for passing on an unsigned and undated "Customer Copy" will also be explored.  Once again, Plaintiffs will argue Defendants cannot have it both ways.

In order to preserve manifest injustice Plaintiffs pray that this court will grant Plaintiffs motion for Reconsideration and reverse the previous order and deny Defendants' Motion to Dismiss for the reasons stated below.

## II.    Applicable Standards

Section 2 of the Federal arbitration Act, 9 U.S.C.S § 2, provides that an agreement in writing to submit to arbitration an existing controversy arising out of the contract shall be valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract.  A court may order arbitration only "upon being satisfied that the making of the agreement for arbitration...is not in issue". 9 U.S.C §4.  Federal courts must "apply ordinary state-law principles that govern the formation of contracts" in determining the

validity of an agreement to arbitrate. Circuit City Stores, Inc. v. Adams, 279 F.3d 889,892

(9th Cir. 2001).

General contract defenses such as fraud, duress or unconscionability, may operate to

invalidate and agreement to arbitrate. General Laws c. 106, § 2-302 (1990 ed.), reads as

follows: "§ 2-302. Unconscionable Contract or Clause.

> "(1) If the court as a matter of law finds the contract or any clause of the contract to
> have been unconscionable at the time it was made the court may refuse to enforce the
> contract, or it may enforce the remainder of the contract without the unconscionable
> clause, or it may so limit the application of any unconscionable clause as to avoid any
> unconscionable result."
> "(2) When it is claimed or appears to the court that the contract or any clause thereof
> may be unconscionable the parties shall be afforded a reasonable opportunity to present
> evidence as to its commercial setting, purpose, and effect to aid the court in making the
> determination."

The standards of determining a contract unconscionable set forth in G. L. c. 106, § 2-

302, are the same standards expressed in Restatement (Second) of Contracts § 208 (1981). "The

issue is one of law for the court, and the test is to be made as of the time the contract was made."

Zapatha v. Dairy Mart, Inc., 381 Mass. 284, 291 (1980).

Under Massachusetts General Laws a contract may be avoided if there is a showing that

the threat overcame the will of a party. Hart Motors Inc. v. Booker, 24 Mass.App.Ct 66

(1962. Massachusetts has also recognized economic duress upon a showing that one side

involuntarily accepted the terms of another, the circumstances permitted no alternative and the

circumstances were the result of coercive acts of the other party. International Underwater

Contractors, Inc. v. New England Telephone and Telegraph Co. Inc. 8 Mass.App.Ct. 340,

342, 393 N.E.2d 968,970 (Mass.App.Ct. 1979).

Massachusetts General Law, allows "avoidance of a contract is allowed if it can be

established that either; 1) a party used a dominant position in a relationship to unfairly

persuade the other to assent to a contract; or 2) there is abuse in a confidential relationship."
Bruno v. Bruno, 384 Mass. 31,34 (1981).

Fraud is defined as a misrepresentation of a material fact made with knowledge of its
falsity (or intentional ignorance of the truth) with the intention that it be acted on by the party
deceived with the misrepresentation justifiably relied upon by the person to the injury.
McGrath v. C.T. Sherer Co., 291 Mass. 35 (1935).   Further, the party claiming fraud does
not have to show that the only reason he entered the contract was because of the false
statement; the key is whether the misrepresentation "materially influenced" Defendants (in this
case Plaintiffs) to enter into the contract. McGrath v. C.T. Sherer Co., 291 Mass. 35 (1935).
In this case, Plaintiffs do not have to show that Defendants intentionally deceived Plaintiffs.  If
the fact stated is ascertainable and was false, it does not matter if the deception was intended,
Defendants are liable for "constructive fraud".  "One party cannot enforce a contract against
another whose signature he has procured by fraud or fraudulent representations, which induced
the signer reasonably to believe and understand that the instrument was substantially different
from what it really was. Boston Five Cents Sav Bank v Brooks, 309 Mass. 52, 55, 34 N.E.2d
435 (1941).  In order to establish fraud in the inducement, the party claiming that there was
fraud must show "misrepresentation of a material fact made to induce action, and reasonable
reliance on the false statement to the detriment of the person relying." Hogan v. Reimer, 35
Mass.App.Ct. 360, 365, 619 N.E.2d 984 (1993).

High-pressure sales tactics and misrepresentation have been recognized as factors
rendering a contract unconscionable. *Industralease Automated & Scientific Equip. Corp.* v.
*R.M.E. Enters., Inc.*, 58 A.D. 2d 482, 488-490 (N.Y. 1977).  If the sum total of the provisions of

a contract drive too hard a bargain, a court of conscience will not assist its enforcement.

*Campbell Soup Co., supra* at 84.

IV.    **Argument**

   1.    **The Arbitration Rider is Unconscionable both Procedural and Substantive and therefore unenforceable.**

   On 1/27/05 Plaintiffs located two cases in which the exact same arbitration rider was

found to be unconscionable on both a substantive and procedural level. Similar cases in

California, ACORN v. Household International Inc; Beneficial California, Inc., See Ex. M, and

Washington, Luna, et al. v. Household Finance Corp. III, et al, See Ex. L, are offered to show

this arbitration agreement should be made null and void. On 2/10/05 Plaintiffs located an article

which reported another case, Mandel v. Household Bank (Nevada), N.A. Cal.App. 4th, Jan 7,

2003, which ruled Defendants Arbitration Agreement unconscionable. Plaintiffs will show that

Massachusetts Contract Law should support the same findings as in these two cases involving

Defendants.

   A.    Procedural Unconscionability

   Defendant's arbitration agreement, the same one allegedly signed by Plaintiff, William

Storie, has been determined, in Luna v. Household and ACORN v Household, to be a contract of

adhesion and therefor procedurally unconscionable.  "An adhesion contract is usually (1) a

standard form, (2) prepared by one party and submitted to another party on a "take it or leave it"

basis, [**15] (3) when the bargaining power between the parties was not truly equal." Luna v

Household.

   Plaintiffs do acknowledge, "Under Massachusetts law, contracts of adhesion are

generally enforceable as long as the contracts are not "unconscionable, offend public policy, or

are shown to be unfair in the particular circumstances." *Chase Commercial Corp. v. Owen*, 32

Mass. App. Ct. 248, 253, 588 N.E.2d 705, 708 (1992). Thus, even if the Plan could be

interpreted as an adhesion contract, a separate showing of unconscionability must be made to

sever the limitation provision. As the **Restatement (Second) of Contracts** clearly points out in

commentary;

> It is to be emphasized that a contract of adhesion is not unconscionable per se, and that all
> unconscionable contracts are not contracts of adhesion. Nonetheless, the more standardized
> the agreement and the less a party may bargain meaningfully, the more susceptible the
> contract or term will be to a claim of unconscionability.

Restatement (Second) of Contracts, Section 208 (1979)." Bull HN Information Systems Inc., v.

Hutson 118 F. Supp. 2d 55; 1999.

Plaintiffs also argue the manner by which and circumstances leading up to, and allegedly

upon, the signing of the arbitration agreement, points to procedural unconscionability. Plaintiffs

will cite similarities between their situation and Waters v. MIN LTD  412 Mass. 64; 587 N.E. 2d

231; 1992. Plaintiffs contend Defendants **targeted** them because, at the time of the loan, they

had a **high debt to income ratios**, had **significant unsecured debt**, had modest income and had

very recently experienced a dramatic decrease in their stock portfolio. Plaintiffs contend that

Defendants direct unsolicited mailing of a "live-check" was a "suggestion" to Plaintiffs they

obtain a loan. Ms. Rauscher, herself, informed Plaintiff that she resigned from Beneficial due to

Defendants expectation that she "telemarket to elderly" in attempts to lure them into sub-prime

loans. Former employees have testified that financial situations very similar to Plaintiffs are who

Defendants have targeted for high-cost loans in the past.

This action on the part of Defendants introduced Plaintiffs to Beneficial Loan Officer,

Suzanne Rauscher, acting as an agent of Defendants. Only after the cashing of the check did

Defendants contact Plaintiff, William Storie. Plaintiff, William Storie then was **invited** to

Defendants office where an initial loan, without mortgage, was entered into. Defendants made it

too easy for Plaintiffs, where they would have had a very difficult time obtaining a loan with another lender. If Plaintiffs were not under the impression that Defendants were well-established business acting in good faith, the ease at which the loan was obtained would have appeared too good to be true. The intrusive marketing, beginning with an unsolicited live check, directly led to this arbitration agreement allegedly being signed. One does not enter into a Wal-Mart and expect to purchase merchandise obtained in fraudulent and illegal manner. Regardless of whether the agreement was signed, or not, Plaintiffs were under extreme financial duress, and Ms. Rauscher knew this.

Plaintiffs were extremely "vulnerable" at the time and the arbitration agreement was signed and directly "influenced" to sign all paperwork involved in the loan including the agreement, if it were presented. When presented with a form document and informed this was contingent upon obtaining the loan, on a "take it or leave it" basis, it more than likely would have been signed, under the circumstances. This information placed Defendants in a very dominant bargaining position. "In such a case, the remedy is to refuse enforcement to the offending provision when a dispute arises after the contract has been entered into and the dominant party is seeking to enforce the provision." Santos v. Lumbermens Mut. Cas. Co., 408 Mass. 70, 86 (1990). Plaintiffs were not at an even plain with Defendants at the time the contract was signed.

B.    Substantive Unconscionability

Plaintiffs content that the following provisions in Defendants arbitration agreement makes the contract exceedingly one-sided and therefore substantively unconscionable; 1) the prohibition on class actions, 2) non-mutuality of legal remedies, specifically with foreclosure, 3) confidentiality of arbitration award, 4) Arbitration costs (fee sharing), 5) Misrepresentation of Ms. Suzanne Rauscher.

1.  Prohibition of Class Actions

Defendants Arbitration Agreement mandates that "no class actions or **joiner** [sic] or consolidation of any claim **of any other person** are permitted in arbitration without the written consent of you and us." (Emphasis added).  This provision effectively limits Plaintiffs and flies in the face of consumer protections. The importance of class actions, particularly in the consumer protection context, is well known:

> The use of the class-action procedure for litigation of individual claims may offer substantial advantages for named plaintiffs; it may motivate them to bring cases that for economic reasons might not be brought otherwise ... [It has played a role] in vindicating the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost ... Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device. Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 338-39, 63 L. Ed. 2d 427, 100 S. Ct. 1166 (1980).

Plaintiffs in this case, argue "that this provision is substantively unconscionable because it is 'clearly designed to make it difficult for [Household] borrowers to vindicate their legal rights." Luna v. Household.  Even if this provision was not directly applicable to the Plaintiff's claims, which we feel is, it should still be struck from the agreement in an effort to erode the contract to be eventually rendered unenforceable. This provision also flies in the face of preferred state and federal importance of class actions.  "Where, as here, an arbitration agreement prohibits class actions, judicial recognition of the value of the class action procedure is counterbalanced by strong public policy favoring enforcement of arbitration agreements." "In Szetela v. Discover Bank, the California Court of Appeal held that a provision of an **arbitration agreement** that prohibited class actions was substantively unconscionable." ACORN v. Household International, Inc. 211 F. Supp. 2d 1160; (2002).  As should occur in this

case, "the court looked beyond the facial neutrality of the provision—which prohibited both the consumer and the credit card company from seeking class status—to the purpose and effect of the provision." ACORN v. Household International, Inc. (citing opinion regarding Szetela v. Discover Bank). Although the agreement appears "facially neutral" the fact that Defendants can strike down any class action claim and "there is no reasonable possibility that **Household** would institute a class action against its borrowers, the provision is effectively one-sided." Luna v. Household Finance.

### 2. Non-Mutuality of Legal Remedies, specifically Foreclosure

Defendant's arbitration agreement states that at the election of either party, any "claim, dispute or contoversy" must be resolved by binding arbitration. However, application of the binding arbitration provision is expressly limited by the following clause:" Luna v. Household

> No provision of, nor the exercise of any rights under [**30] this Arbitration Rider shall limit the right of any party during the pendency of any Claim, to seek and use ancillary or preliminary remedies, judicial or otherwise, for the purposes of realizing upon, preserving, protecting or foreclosing upon any property involved in any Claim or subject to the loan documents. (Household International, Beneficial Finance, Beneficial "Massachusetts" Arbitration Agreement). See Ex. J.

Plaintiffs in this case, and in Luna v. Household, "argue that this provision is substantively unconscionable because **Household** 'has retained the right to access the courts in every conceivable situation where they would want secure judicial relief' while prohibiting borrower access to a judicial forum." Luna v. Household.   Again, in this instance Defendants try to have it both ways; they can always restrict the access of the courts of the borrower but maintain "ancillary or preliminary remedies" in the courts for the only reason they would conceivably access the courts, foreclosure. "At times this provision may benefit borrowers; at times it may benefit Household. However, for any claim that a borrower may assert against Household--such as the claims asserted in this action--the Arbitration Rider bars access to the courts unless both

14

parties agree otherwise. This provision is one-sided in Household's favor and overly harsh to

borrowers. As such, it weighs in favor of finding the Arbitration Rider substantively

unconscionable." See  ACORN, 211 F. Supp. 2d at 1173 (same).

> As noted above, the arbitration agreements are contracts of adhesion imposed by a
> sophisticated corporate lender on less financially sophisticated borrowers. In this
> circumstance, the doctrine of contra proferentem dictates that all ambiguities in the
> agreement be construed against Defendants. Black's Law Dictionary 328 (7th Ed. 1999).
> Therefore, the agreement will be interpreted according to the reasonable interpretation of
> the borrowers. ACORN v. Household Int., (citing Lawrence v. Walzer & Gabrielson, 207
> Cal. App. 3d).

Defendants ability to display both a signed and an unsigned copy of their arbitration

agreement appears to bolster this argument further.   Defendants, in their loan agreement, have

several provisions where they can rescind the loan agreement, "Default and Cancellation of

Agreement". See Ex. P (page 4 of 6).  There are nine provisions where Defendants reserve the

"right to terminate your Credit Line Account and to require you to pay your entire balance plus

all other accrued but unpaid charges immediately because of . . . (See A through I).   If

Defendants reserve the right to be able to present either a signed or unsigned copy of the

Arbitration Agreement, this places them in an extremely advantageous position.  They can then

allege a Defendant did not sign an arbitration agreement and proceed through the courts system.

Again, Arbitration copy that Plaintiff has states it is a "customer copy". See Ex. O compare to

Ex. J.

### 3.  Confidentiality Mandate in Arbitration Agreement is Unconscionable

The Arbitration Rider mandates that any arbitration "award shall be kept confidential."

[**32] Plaintiffs argue that this provision "unfairly favors Household as a repeat participant in

the arbitration process." Luna v. Household.

> As with the class action and the ancillary or preliminary remedies provisions, the
> confidentiality clause is facially neutral. However, its application disproportionately favors

15

Household. The advantages repeat participants possess over "one time" participants in arbitration proceedings are widely recognized in legal literature and by federal courts. See, e.g., Cole v. Burns Int'l Sec. Servs., 323 U.S. App. D.C. 133, 105 F.3d 1465, 1476 (D.C. Cir. 1997); ACORN, 211 F. Supp. 2d at 1172; Ting, 182 F. Supp. 2d at 931-33. The Cole Court recognized that repeat arbitration participants gain advantages due to   [*1181] superior knowledge regarding arbitrators, that "a lack of public disclosure may systematically favor companies over individuals," and that "the unavailability [**33] of arbitral decisions also may prevent potential plaintiffs from locating the information necessary to build a case of intentional misconduct or to establish a pattern or practice of discrimination by particular companies." Cole, 105 F.3d at 1476-77. As noted by the ACORN Court, "by keeping all awards confidential, any advantages that inure to Defendants as repeat participants are effectively concealed, thereby preventing the scrutiny critical to mitigating those advantages." Luna v. Household citing ACORN, 211 F. Supp. 2d at 1172.

Plaintiffs contend that they are more at a disadvantage proceeding pro se in arbitration. Plaintiffs have no ability to gauge any potential award as to fair or not. Plaintiffs will, more than likely, see an arbitration forum only once in their lives. Plaintiffs, pro se, may be more likely to experience the "Repeat Player Effect". Emp. Rts. & Employment Poly. J. 189, 213 (1997). (potential reasons for the repeat player advantage in arbitrations include: "unequal information in arbitrator selection," "unequal representation at the hearing," a repeat participant's ability to screen out and settle meritorious cases, and the arbitrator's incentive to satisfy repeat customers); Armendariz, 24 Cal. 4th at 115 (size of employee award in arbitration is lower when employer is a repeat participant).

4.  Arbitration Costs

For claims initiated by the borrower, the Arbitration Rider contains the following provision regarding the allocation of fees:

> a)  Lender agrees to pay for the initial cost of the filing the Claim up to the maximum amount $ 100.00; (b) for the filing costs over $ 100.00, such additional cost shall be divided equally between us up to the amount charged by the arbitration administrator for a Claim equal to your loan amount; and (c) all costs over the amount charged by the arbitration administrator for a Claim equal to your loan amount [**35] shall be paid by you. The cost of up to one full day of

arbitration hearings will be shared equally between us. Fees for hearings that exceed one day will be paid by the requesting party. See Ex. A.

"In Circuit City, the Ninth Circuit held that a requirement in an arbitration agreement that the employee and employer [**41] split the arbitrator's fee "would render an arbitration agreement unenforceable." 279 F.3d at 894; see also Ting, 182 F. Supp. 2d at 934 (costs of arbitration render provision unconscionable because "having to advance such substantial sums will deter many litigants from proceeding"). This holding from the Ninth Circuit relies on the California Supreme Court's decision in Armendariz.  Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 92 Ed. 2d. 373,121 S. Ct. 513 (2000) shares the belief that "large arbitration costs could preclude a litigant ...from effectively vindicating her federal statutory rights in the arbitral forum" In Luna, "Plaintiffs insist (and showed evidence to support) that **pursuant to the Arbitration Rider** and the fee provisions of the three eligible arbitration agencies (National Arbitration Forum, American Arbitration Association, and JAMS), the cost of a two to three day hearing would range from $ 4,100 to $ 6,200. (Plaintiffs' Opposition at 15; Parlette Decl. PP 34, 47, 56). (Emphasis Added).  Further, "based upon the evidence submitted, [*1182] the Court finds that a borrower's cost for arbitration likely would exceed [**36] the cost of a court proceeding by at least a factor of ten. See, e.g., Parlette Decl. PP 34, 47, 56 (calculating likely fees); Parlette Decl. Ex. A at 39 (for claim between $ 50,000 and $ 75,000, National Arbitration Forum costs include $ 240 filing fee, $ 240 commencement fee, $ 1,250 administrative fee, and $ 1,000 participatory hearing fee). Luna v. Household Finance Corp.  These figures would be presumably more expensive given this case is more than 2 years old.

5.   New Evidence from Former Loan Officer, Suzanne Raucsher

Defendants can not admit that the signing of the arbitration agreement is a condition of obtaining the loan since this is nowhere in writing. However, Ms. Suzanne Rauscher, former

17

Beneficial Loan Officer and Loan officer of Plaintiff's Loan, has stated to Plaintiff, William

Storie on 2/4/05, that during her training by Defendants, she was told that the loan was not to be

sold unless their was a signed arbitration agreement. This statement puts at issue several

questions; 1) is this Fraudulent and material misrepresentation, 2) is this Fraudulent inducement

in signing the arbitration agreement, 3) does this make the arbitration agreement null and void.

If Defendants answer "no" to the question of whether the selling of the loan is contingent

upon the signing of the arbitration agreement, but they trained their loan officers that it was, they

are guilty of fraud in the inducement of the arbitration agreement and material misrepresentation.

If Defendants answer "yes" to this question, the arbitration agreement should become part of the

loan agreement and cannot be looked at separate from the other loan documents. It would also

further support a finding of substantive and procedural unconscionability in that, if true, is not

stated anywhere on the arbitration agreement or the loan agreement. This would be a crucial

contractual issue that must be in writing. Further, if so, this should raise an argument that the

length and complexity of the loan agreement documents, including the arbitration agreement,

should be scrutinized by the court and determined to be unconscionable.

Loan officer, Rauscher was well aware of Plaintiffs dire financial picture at the time this

Arbitration Agreement was allegedly signed.   The arbitration agreement or no loan, the car loan

or no loan. The abuses in the dealings of this Arbitration Agreement allegedly being signed and

the loan are outrageous. Plaintiff, Mr. Storie, if it was a mandate was looking at a situation quite

literally, either sign the agreement or possibly lose their home.

Another issue the court should observe is that Plaintiff, William Storie did not date the

Arbitration Rider, nor was there a designated "date" area on the agreement.  Plaintiffs have

offered evidence that Defendants have altered forms, changed dates, payment periods, omitted

forms and information. Plaintiffs do not feel it is a stretch, under the circumstances to wonder if this is the arbitration agreement from the initial loan and the date was changed. Plaintiffs feel, at minimum, they should be offered the arbitration agreement from the first loan obtained as a result of the unsolicited live check loan.

## III.    Conclusion

In Defendants' Arbitration Rider the provisions regarding class actions, non-mutuality of legal remedies, confidentiality of awards, arbitration costs and fee sharing, as well as new evidence from former loan officer Susan Raucsher and Plaintiffs' unsigned copy of the Arbitration Agreement, taken together, "grossly favor Household." (Defendants). Honorable Judge Robert S. Lasnik, in his opinion in Luna v. Household concluded, "...the consumer nature of the transactions at issue magnifies the impermissible effects of the class action, use of court proceedings for ancillary or preliminary remedies, confidentiality, and fee sharing provisions. The **totality of the circumstances** has established a fundamental unfairness, which makes the Arbitration Rider unconscionable and unenforceable..."(emphasis added)

Judge Lasnik continued:

> The Arbitration Rider contains a severability clause. However, an unlawful provision [**41] may taint an entire agreement, making judicial reformation inappropriate. See Graham Oil Co. v. ARCO Prods. Co., 43 F.3d 1244, 1249 (9th Cir. 1995). Here the unconscionable provisions are interrelated and each **serves to magnify the one-sidedness of the others**. As such the Arbitration Rider is **tainted with illegality**. Therefore the Court finds that severance of the offending provisions is inappropriate and that the Arbitration Rider is unenforceable. Luna v. Household (emphasis added).

In ACORN v. Household International Inc. Honorable Judge Claudia Wilken came to a similar conclusion stating:

> The provisions of the arbitration agreement discussed in this order are all, to varying degrees, **one-sided** and **overly harsh** in their effect on Plaintiffs. These provisions, moreover, are **interrelated in such a way that the unfairness of the arbitration agreement is magnified**. The prohibition on class actions eliminates the financial

incentive to bring a claim, while the cost-splitting provision increases the disincentive to vindicate any alleged violations. The individual plaintiff who is not deterred will find that the confidentiality provision prevents him or her from becoming aware of prior arbitral precedent directly on point, while Defendants suffer no such disability.

The interlocking nature of these hindrances indicates that the purpose of the arbitration agreement is not to transfer claims to a more expeditious forum, but to deter Defendants' customers from bringing claims. As such, the agreement's purpose is "tainted with illegality" and severance is not appropriate. ACORN v. Household International.

For the reasons set forth above, as well as to prevent manifest injustice, Plaintiffs request this Honorable Federal Court to reconsider its granting of Defendants' Motion to Dismiss and reverse the decision compelling this case forward in a judicial forum. Plaintiffs appreciate the consideration given by this Federal Court in its allowing this motion and memorandum.

Plaintiffs,

William A. and Maritza Storie, *Pro Se*

59 Crawford Road
Oakham, MA 01068
508-882-3810

## Certificate of Service

I certify that the within Memorandum of Law in reply to Defendants' Objection to Plaintiffs' Motion for Complaint Modification was served upon the following counsel for Defendants, Household International, INC. and Beneficial Finance Corp., by USPS priority mail on February 14, 2004.

Schechtman Halperin Savage, LLP
Christine L. DeRosa
86 Weybosset Street
Providence, RI 02903


William A Storie
59 Crawford Road
Oakham, MA 01068